IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LISA GREGER, | ) | CASE NO.  1:21-CV-02327-PAG |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE PATRICIA A. GAUGHAN |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

Plaintiff, Lisa Greger, ("Plaintiff" or "Greger"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her deceased divorced spouse, Charles Greger's ("Charles"),[2] application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

[2] Lisa Greger filed an HA-539 substitute party form with the Social Security Administration on October 15, 2021.  (Doc. No. 7 at 4.)  Plaintiff asserts she has standing to bring suit in this case. (*Id.*)  Defendant does not dispute Plaintiff's standing.

## I.   PROCEDURAL HISTORY

In November 2015, Charles filed an application for SSI, alleging a disability onset date of July 1, 2008[3] and claiming he was disabled due to: orthopedic problems; back problems; right shoulder; prostate cancer stage 1; hypertension; depression; right heel plantar fasciitis; sleep apnea; GERD; overactive bladder; chronic pancreatitis; and degenerative disc disease. (Transcript ("Tr.") 142, 168, 251.)   The application was denied initially and upon reconsideration, and Charles requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

On October 30, 2017, an ALJ held a hearing, during which Charles, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On March 6, 2018, the ALJ issued a written decision finding Charles was not disabled.  (*Id.* at 15-25.)  The ALJ's decision became final on July 30, 2018, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On September 24, 2018, Charles filed his Complaint to challenge the Commissioner's final decision.  (*Id.* at 1653.)  By joint stipulation of the parties, the Court remanded the case back to Commissioner on May 3, 2019.  (*Id.* at 1655.)

On July 1, 2020, the ALJ held another hearing, during which Charles, represented by counsel, and an impartial VE testified.  (*Id.* at 1594.)  On July 21, 2020, the ALJ issued a written decision finding Charles not disabled before his 55th birthday on April 22, 2020 but disabled after that point.  (*Id.* at 1593-1606.)  The ALJ's decision became final on October 15, 2021, when the Appeals Council declined further review.  (*Id.* at 1582-88.)

---

[3] Under 20 C.F.R. § 416.335, SSI benefits are payable as of the month following the month of application. Therefore, the period at issue begins on November 16, 2015, the date of application, regardless of the alleged onset date.  Because Charles's date last insured was December 31, 2012, Charles was eligible for SSI benefits only.  (Doc. No. 7 at 4; Transcript ("Tr.") at 1593.)

On December 10, 2021, Greger filed her Complaint to challenge the Commissioner's final decision.[4]  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7, 9-10.)  Greger asserts the following assignments of error:

(1)  The ALJ Committed an Error of Law by Failing to Consider Charles' Mental Impairments as Severe.

(2)  The ALJ Committed an Error of Law by Failing to Properly Evaluate Charles' Right Shoulder Condition.

(3)  The ALJ Erred by Not Following the Requirements of SSR 96-8p when Making the RFC Finding, and the RFC Finding is not Supported by Substantial Evidence.

(Doc. No. 7.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Charles was born in April 1965 and was 55 years-old at the time of his administrative hearing (Tr. 251, 1594), making him a "person of advanced age" under Social Security regulations.  *See* 20 C.F.R. § 416.963(e).  He had at least a high school education and was able to communicate in English.  (Tr. 1604.)  He had past relevant work as a machine operator and cook.  (*Id*. at 1603.)

### B.  Medical Evidence

On October 6, 2014, Charles saw Jill Weiss, PA-C, after an abnormal prostate biopsy.  (*Id.* at 1430.)  Weiss noted Charles was accompanied by his mother and that he was a "vague historian."  (*Id.*)  Charles reported short-term and long-term memory issues that his mother stated started after his coma in 2008, intermittent numbness and tingling in the arms down to the fingers bilaterally, chronic back pain for which he received monthly Toradol injections, a history of chronic pancreatitis, insomnia, and depression

---

[4] Charles passed away on September 16, 2021.  (Doc. No. 7 at 8.)

from his pain.  (*Id.* at 1432-33.)  On examination, Weiss found no rubs, murmurs, or gallops, normal extremities, normal gait, grossly intact sensation, and equal grip bilaterally on gross testing.  (*Id.* at 1434.)

On October 9, 2014, Charles saw Glenn Meden, M.D., for a preoperative pulmonary evaluation ahead of a planned prostate surgery.  (*Id.* at 1336.)  Charles reported smoking a pack of cigarettes a day for the past 34 years.  (*Id.*)  He had been prescribed inhalers in the past, but they cost too much money so when he is short of breath, he uses his mother's albuterol inhaler.  (*Id.*)  Charles reported shortness of breath after walking approximately 200 yards, although back pain also stopped him from walking further. (*Id.*)  Charles also complained of a productive cough on a daily basis.  (*Id.*)  Charles further reported a history of moderate sleep apnea for which he did not use a CPAP because it was too expensive and caused headaches.  (*Id.*)  On examination, Dr. Meden found regular heart rhythm with no murmur or JVD, no accessory muscle use with respiration, chest normal to percussion, clear lungs on auscultation, no edema, good memory, and normal gait.  (*Id.* at 1338.)  Dr. Meden concluded that Charles's COPD symptoms were more consistent with the diagnosis of chronic bronchitis as he had normal lung mechanics.  (*Id.* at 1339.)  Dr. Meden diagnosed Charles with moderate OSA, for which he was non-compliant with therapy, morbid obesity, toxic affect of tobacco cigarette, and carboxyhemoglobinemia.  (*Id.*)

On October 16, 2014, Charles underwent laparoscopic radical prostatectomy with bilateral nerve sparring for his prostate cancer.  (*Id.* at 1437-39.)

On November 20, 2014, Greger went to the emergency room reporting he had fallen after slipping on ice and hit the back of his head on the ground.  (*Id.* at 424.)  Greger complained of headache and back pain.  (*Id.*)  On examination, treatment providers found normal range of motion and tenderness.  (*Id.* at 426.)  At discharge, Greger reported feeling better and treatment providers noted he was improved and stable.  (*Id.*)

CT imaging done that same day revealed spondylosis of the spine and some "chronic appearing ossifications anterior to the dens and along the anterior margin of the C3-4 disc." (*Id.* at 1367-69.) X-rays of the lumbar spine taken the same day revealed moderate narrowing of the L5-S1 disc space, mild narrowing of the L4-5 disc space, spurring at the L5 level, normal spinal alignment, and no acute changes. (*Id.* at 1372.)

On December 8, 2014, Charles saw J. Britten Shroyer, M.D., for follow up of his right shoulder pain. (*Id.* at 1252.) Charles reported his periodic injections helped his shoulder pain. (*Id.*) On examination, Dr. Shroyer found appropriate affect, normal gait, pain in the impingement position of the shoulder, and satisfactory shoulder strength. (*Id.* at 1255.) Dr. Shroyer administered another Depo-Medrol injection into the right subacromial space. (*Id.*)

On April 8, 2015, Charles saw Nicholas Horton, M.D., for a comprehensive problem evaluation and CPE. (*Id.* at 368.) Charles reported pain that waxed and waned. (*Id.*) He told Dr. Horton that day was a bad day; he had taken the garbage out the night before and thought his pain was worse than that. (*Id.*) Charles described his pain as located in the lower back that shot down his right leg, worse with right leg extension, and interrupted his sleep. (*Id.*)

On July 31, 2015, Charles received a Toradol injection in his left upper quadrant gluteus. (*Id.* at 1187.)

On August 25, 2015, and then again on September 8, 2015, Charles received Toradol injections in the right upper gluteal area. (*Id.* at 1181.)

On October 22, 2015, Charles's mother called the office of Freddie Fuentes, M.D., reporting Charles was "experiencing severe lower back pain," although he was at CVS at the time and was able to move around and run errands. (*Id.* at 1177-78.) Charles's mother told the nurse Charles said he had to stay busy. (*Id.* at 1178.) Charles himself called the office later that day and reported worsening back pain

5

of the past two days, with his current pain at a 9/10.  (*Id.*)  Charles reported he was walking independently and was taking Vicodin and muscle relaxers.  (*Id.*)  Charles requested a Toradol injection, which was scheduled for the afternoon of October 23, 2015.  (*Id.*)

On November 13, 2015, Charles's mother called requesting a Toradol injection for Charles after he had fallen the day before.  (*Id.* at 374.)  She reported Charles had fallen when picking up his son from school.  (*Id.*)  He was able to get up on his own, but he hit the side of his head, and he hurt "all over" the next day.  (*Id.*)  When the nurse explained Charles needed to be seen before receiving an injection since he had fallen, Charles's mother said he could not afford the $25 copay and hung up.  (*Id.*)

X-rays of the lumbar spine taken December 16, 2015 revealed moderate degenerative disc disease at L5-S1 and mild degenerative disc disease at L4-L5 that had "mildly progressed."  (*Id.* at 1228.)

On January 12, 2016, Charles saw Natalie Whitlow, Ph.D., for a consultative psychiatric evaluation.  (*Id.* at 1124.)  Charles attended the appointment with his mother, and both provided relevant information during the evaluation.  (*Id.* at 1124-25.)  Charles reported pain prevented him from working. (*Id.* at 1125.)  He complained of lower back pain, right shoulder pain, problems standing and sitting, osteoarthritis and disc degeneration, inability to bend over or squat, inability to do list his arms over his head, inability to lift anything over three pounds because of his back pain, and poor memory.  (*Id.*) Charles could not remember when he last worked, but he told Dr. Whitlow he had been injured while working full-time at Walmart but was terminated after he was physically unable to do the job on a part-time/light duty basis.  (*Id.* at 1126.)  Charles reported depression and taking an antidepressant, but he refused to provide Dr. Whitlow with any further information.  (*Id.*)  Charles also refused to tell Dr. Whitlow about his activities of daily living, insisting his mother could provide the relevant information. (*Id.*)  However, Charles's mother did not have much relevant information to provide.  (*Id.*)

On examination, Dr. Whitlow found Charles's appearance dirty and poorly kept, with dirty nails and skin, and strong, foul body odor, poorly groomed head and facial hair, and disheveled appearance. (*Id.* at 1127.)  Charles maintained minimal eye contact, keeping his eyes closed most of the time, and his eyes were glossy and red.  (*Id.*)  Charles demonstrated pleasant and cooperative behavior until the end of the interview, when he became "irate" with Dr. Whitlow and refused to provide any further information. (*Id.*)  Dr. Whitlow noted Charles winced in pain and showed difficulty moving and breathing, but he appeared to be of sound mind, alert, attentive, and coherent.  (*Id.*)  Dr. Whitlow determined Charles's speech was normal, but his thought process appeared inappropriate as he reported and presented with a poor memory.  (*Id.*)  Charles demonstrated a stable and appropriate affect.  (*Id.*)  Charles told Dr. Whitlow he did not "feel as if his depression impairs his ability to effectively engage in the work world."  (*Id.*) Based on his responses to Dr. Whitlow's questioning, she determined he appeared to possess average cognitive functioning, fair insight, and poor judgment.  (*Id.* at 1128.)  Dr. Whitlow diagnosed Charles with unspecified depressive disorder and stated:

> The claimant's self-report was consistent with his chief complaint that he has physical medical health conditions that impede his ability to work and does not experience any mental health symptoms that contribute to his inability to work.  The claimant's affect was stable and appropriate during the clinical interview, as were his presentation, communication, and thought processing.

(*Id.* at 1129.)  Dr. Whitlow opined Charles would not have any limitations in the four areas of mental functioning from a mental health perspective.  (*Id.* at 1129-30.)

On March 7, 2016, Charles saw Robert Nickodem, Jr., M.D., for a right quadriceps tendon rupture. (*Id.* at 1151-52.)  Charles reported injuring his right knee two weeks earlier.  (*Id.* at 1152.)  Dr. Nickodem noted Charles was using a cane and was in "mild to moderate discomfort."  (*Id.* at 1152-53.)  On examination, Dr. Nickodem found no pain with rotation of either hip, negative straight leg raise bilaterally, 30 degrees extension of the right knee, tenderness to palpation of the superior and medial

7

retinaculum and the quadriceps tendon, weakness with resisted extension, no gross instability of the right knee, right knee flexion from 30 to 115 degrees, negative Homans bilaterally, and normal neurovascular examination. (*Id.* at 1153.)  Dr. Nickodem recommended surgical repair. (*Id.* at 1155.)

On March 11, 2016, Charles underwent surgery for right quadriceps tendon rupture repair. (*Id.* at 1139.)

On March 25, 2016, Charles saw Dr. Nickodem for a two-week post-operative follow up appointment. (*Id.* at 1136.)  Charles reported being a little more comfortable and reported using a walker and a knee immobilizer in full extension. (*Id.*)  On examination, Dr. Nickodem found Charles in no acute distress with his right knee wound looking good. (*Id.* at 1138.)  Dr. Nickodem noted the extensor mechanism seemed like it was intact, Charles could flex approximately 35 to 40 degrees, Homans examination was negative, and his neurovascular examination was grossly normal. (*Id.*)  Dr. Nickodem ordered physical therapy to start four weeks after surgery. (*Id.*)

On April 11, 2016, Charles saw Dr. Fuentes for follow up. (*Id.* at 1484.)  Charles reported he still had his right knee brace and could not bear weight on his leg. (*Id.*)  Charles told Dr. Fuentes he was using a walker, although that day he was in a wheelchair. (*Id.*)  Charles reported he was to start physical therapy the next day. (*Id.*)  On examination, Dr. Fuentes found some lower back pain on both sides of the lower spine, negative straight leg raise test, no CVA tenderness, and some decreased flexion and extension of the lumbar spine. (*Id.* at 1489.)

On May 5, 2016, Charles saw Augusto Hsia, M.D. (*Id.* at 1500.)  Dr. Hsia noted that Charles had last been seen in 2013 for chronic low back pain, polyarthralgia, chronic headaches, depression, and mild spondylosis. (*Id.*)  Charles reported same or worse low back pain that he described as constant, burning, and stabbing, and that he rated as 7-8/10. (*Id.*)  Bending, lifting, and standing aggravated his pain. (*Id.*)  Charles did woodworking, but was limited by his back pain, shoulder pain, and quadricep pain. (*Id.*)

Charles reported his mother had sent back to Dr. Hsia as he had new lawyers in his disability case, and they wanted new documentation.  (*Id.*)  On examination, Dr. Hsia found antalgic gait, normal posture and spinal curves, palpable muscle spasm and/or tenderness at the midline and upper and lower lumbar regions, decreased lumbar flexion and extension, decreased reflexes, normal muscle strength and foot flexion/extension on the left, knee immobilizer on the right, normal tone, negative straight leg raise bilaterally, and intact sensation.  (*Id.* at 1505-06.)  Dr. Hsia noted his only recommendation was the chronic pain rehabilitation program, but Charles appeared pessimistic about the program.  (*Id.* at 1506.)  Dr. Hsia further noted Charles was very sedentary and scored high on the depression/disability scale, and that Charles would refuse any physical therapy.  (*Id.*)

On June 10, 2016, Charles saw Dr. Nickodem for follow up of his right quadriceps tendon tear.  (*Id.* at 1463.)  Charles reported the quadriceps tendon repair was more comfortable, but he had pain around the patellar tendon area.  (*Id.*)  Charles told Dr. Nickodem he could bear weight on his right leg without using a cane or brace.  (*Id.*)  On examination, Dr. Nickodem found Charles ambulating without an assistive device in mild discomfort from the right patellar tendon area.  (*Id.* at 1466.)  Charles could perform a straight leg raise on the right, his extensor mechanism seemed intact, and he demonstrated a range of motion from five degrees to 115 degrees of flexion.  (*Id.*)  Dr. Nickodem found no swelling of the right knee, no significant tenderness to palpation of the quadriceps tendon, some tenderness to palpation of the proximal patellar tendon, no instability, negative McMurray's maneuver, negative Homan's exam, and intact neurovascular exam.  (*Id.*)  Dr. Nickodem's assessment consisted of improving status post right quadriceps tendon repair and right patellar tendonitis.  (*Id.*)  Dr. Nickodem told Charles he could discontinue using the knee immobilizer brace, he could weight-bear as tolerated, and he should continue with his exercises.  (*Id.*)

On March 1, 2017, Charles saw Dr. Nickodem for follow up of his right knee pain.  (*Id.* at 1448.)
Charles reported continued pain in the mid-patellar tendon region.  (*Id.*)  Charles told Dr. Nickodem he
had undergone physical therapy and ionophoresis, which had helped.  (*Id.*)  Dr. Nickodem noted a
September 20, 2016 MRI revealed a healed quadriceps tendon with some patellar tendonitis.  (*Id.*)  On
examination, Dr. Nickodem found normal ambulation without an assistive device, no pain with hip
rotation bilaterally, negative straight leg raise bilaterally, good quad mechanism strength, no tenderness to
palpation of the quadriceps tendon but tenderness to palpation of the mid patellar tendon area, intact
extensor mechanism, full extension, flexion to 110 degrees, no instability of the right knee, negative
McMurray's maneuver, negative Homans exam bilaterally, and grossly intact neurovascular examination.
(*Id.* at 1451.)  Dr. Nickodem diagnosed Charles with right knee pain secondary to mild patellar tendinitis
and recommended he stop smoking, consult the bariatric/metabolic institute, and undergo physical
therapy.  (*Id.*)

Charles received Toradol injections in his upper right/left quadrant gluteus in March through July
2018.  (*Id.* at 1814-17, 1830-31.)

On August 24, 2018, Charles saw Dr. Fuentes for follow up.  (*Id.* at 1832.)  Charles reported
continued back pain but denied arm or leg edema and weakness of the arms and legs.  (*Id.* at 1839.)  On
examination, Dr. Fuentes found some lower back pain to palpation on both sides of the lower spine,
negative straight leg raise test bilaterally, no CVA tenderness, some decreased flexion and extension of
the lumbar spine, normal gait, no edema, normal pulses bilaterally, and some left hip pain that Charles
said hurt more when he walked.  (*Id.* at 1839-40.)

Intake notes dated October 11, 2018 noted lower back pain that Charles rated as an 8/10 and
described as burning and sharp that radiated to his legs bilaterally.  (*Id.* at 1848.)

10

That same day, Charles saw Dr. Hsia for follow up of his low back pain.  (*Id.* at 1849.)  Dr. Hsia noted he had last seen Charles in 2016.  (*Id.*)  Charles reported feeling worse and asked about a spinal tap to help with his pain.  (*Id.*)  Charles told Dr. Hsia he helped his mom a bit and cooked for her.  (*Id.*)  Charles reported feeling tired most of the time, being mostly sedentary, and continuing to smoke.  (*Id.*)  Charles stated he could only walk for five minutes or about one block before he had to stop because of back pain and fatigue.  (*Id.*)  Charles complained of constant leg, knee, and back pain that was worse with walking and standing.  (*Id.*)  Dr. Hsia noted Charles did not remember seeing him in 2013 or 2016.  (*Id.*)  On examination, Dr. Hsia found antalgic gait, normal posture and spinal curves, palpable muscle spasm and/or diffuse tenderness in the lumbar and gluteal regions to light touch, decreased flexion and extension, decreased reflexes, normal lower extremity strength, normal muscle tone, negative straight leg raise test bilaterally, intact sensation to light touch, and tenderness to touch of the right knee scar.  (*Id.* at 1853-54.)  Dr. Hsia noted a "significant" deconditioning component.  (*Id.* at 1854.)  Dr. Hsia again recommended the chronic pain rehabilitation program to Charles, and this time Charles was at least willing to be evaluated for the program.  (*Id.*)  Dr. Hsia also recommended Charles consult pain psychiatry for his depression.  (*Id.*)

On December 24, 2018, Charles saw Dr. Fuentes for follow up.  (*Id.* at 1857.)  Charles reported continued back pain and told Dr. Fuentes the pain was bad that day.  (*Id.* at 1863.)  Charles denied weakness of the arms and legs.  (*Id.* at 1864.)  On examination, Dr. Fuentes found lower back pain to palpation on both sides of the lower spine, negative straight leg raise test, no CVA tenderness, some decreased flexion and extension of the lumbar spine, and normal gait.  (*Id.*)  Dr. Fuentes administered a Toradol injection and a flu shot.  (*Id.* at 1866-67.)

On February 27, 2019, Charles saw Linda Barrus, NP, for a comprehensive problem evaluation.  (*Id.* at 1868.)  Charles reported his only complaint was constant back pain and he denied having any other

issues.  (*Id.*)  Charles told Barrus he was only there for his yearly visit because his insurance company required it.  (*Id.*)  Charles described constant burning, throbbing pain in his low back.  (*Id.*)  In addition to pain medication, Charles smoked marijuana whenever he could get it because it helped the pain and helped him sleep.  (*Id.*)  He did not exercise because of pain, he did not follow any particular diet, and he only drank diet soda.  (*Id.*)  He continued to smoke a pack a day and had no interest in quitting.  (*Id.*)  He refused to wear a CPAP for his sleep apnea, even though he understood the stress sleep apnea put on his body, because the CPAP gave him migraines.  (*Id.*)  He reported headaches every other day that he said ran in his family and reported poor memory since a medically induced coma after surgery more than 10 years ago.  (*Id.*)  He could not walk 100 yards.  (*Id.*)  Charles reported he did not enjoy anything anymore and just did as he was told.  (*Id.*)  Barrus noted she discussed pain management, physical therapy, and other available options to help him become more mobile if he was willing to put in the work, and Charles responded he was not interested in any of it.  (*Id.*)  Charles requested a Toradol injection.  (*Id.*)  On examination, Barrus found decreased range of motion of the back and normal extremities.  (*Id.* at 1871.)  Barrus discussed Charles's depression with him, and he said he was not interested in making any changes.  (*Id.* at 1872.)  Charles refused pain management and physical therapy for his back pain.  (*Id.*)  Barrus administered a Toradol injection.  (*Id.*)

On April 18, 2019, Charles saw Dr. Fuentes for follow up.  (*Id.* at 1880.)  Charles admitted to using marijuana lately as it helped with his chronic pain.  (*Id.* at 1881.)  Charles reported continued back pain and that his pain was bad that day.  (*Id.* at 1887.)  Charles also told Dr. Fuentes it was hard to get up in the morning.  (*Id.*)  Charles denied leg or arm edema as well as arm and leg weakness.  (*Id.*) On examination, Dr. Fuentes found lower back pain to palpation on both sides of the lower spine, negative straight leg raise test, no CVA tenderness, decreased flexion and extension of the lumbar spine, and normal gait.  (*Id.* at 1887-88.)  Charles denied crying spells and reported his headaches were better on

Neurontin. (*Id.* at 1888.)  Dr. Fuentes noted Charles' depression was stable. (*Id.*)  Dr. Fuentes administered a Toradol injection that day. (*Id.* at 1889.)

On March 4, 2020, Charles saw Marina Tudico, PA, for evaluation of his chronic lower back pain, bilateral leg pain, neck pain, and right shoulder pain. (*Id.* at 1893.)  Tudico noted Charles had not done the chronic pain rehabilitation program as recommended by Dr. Hsia. (*Id.*)  Charles reported chronic right shoulder pain for the past 10-15 years with a history of three shoulder surgeries, neck pain for the last six to seven months, intermittent left arm tingling, chronic lower back pain, and posterior bilateral leg pain, right worse than left. (*Id.*)  Charles told Tudico his shoulder hurt the most. (*Id.* at 1894.)  Charles requested an injection, which Tudico stated she did not perform. (*Id.* at 1893.)  On examination, Tudico found normal strength, normal gait, intact sensation, pain with any range of motion of the right shoulder, no hyper-reflexia, and negative Hoffman's and clonus tests. (*Id.* at 1898.)  Tudico recommended physical therapy for Charles's neck, shoulder, and low back pain, referred him to pain management for potential spinal injections in the future, recommended he see sports medicine for his shoulder, and ordered cervical and lumbar x-rays. (*Id.* at 1900.)

A March 5, 2020 x-ray of Charles's cervical spine revealed straightening of the normal cervical lordosis, multilevel mild to moderate disc space narrowing with endplate sclerosis, and small osteophytes. (*Id.* at 1809-10.)  An x-ray of Charles's lumbar spine taken the same day revealed Grade 1 L4 on L5 anterolisthesis, moderate disc space narrowing at L5-S1, endplate sclerosis, minimal endplate osteophytes, and facet arthropathy, with moderate to severe foraminal encroachment at L5- S1. (*Id.*)

## C.   State Agency Reports

### 1.     Mental Impairments

On January 15, 2016, state reviewing consultant Karla Voyten, Ph.D., reviewed the file and opined Charles had mild limitations in performing his activities of daily living, maintaining social functioning,

and maintaining concentration, persistence, and pace.  (*Id.* at 118.)  Dr. Voyten noted Charles' treating

physician "consistently note[d] depression stable on Zoloft and trazadone" and Charles denied crying

spells, so his psychiatric impairments were not severe at that time.  (*Id.*)  Dr. Voyten explained:

> I have looked at the final findings of the ALJ MRFC and find that the new
> file does contain new and material evidence.  The ALJ MRFC is not being
> adopted because more recently received evidence from his TS at Cleveland
> Clinic as well as psych CE show claimant's mental functioning is improving
> w/ medication.

(*Id.*)

On April 19, 2016, on reconsideration, Bruce Goldsmith, Ph.D., affirmed Dr. Voyten's findings.

(*Id.* at 147.)

### 2.     Physical Impairments

On November 29, 2015, state reviewing consultant Steve McKee, M.D., reviewed the file and

opined Charles could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds,

stand and/or walk about six hours in an eight-hour workday, sit for about six hours in an eight-hour

workday, and had an unlimited ability to push and/or pull, other than shown for lift and/or carry.  (*Id.* at

120-21.)  Dr. McKee further opined Charles could occasionally climb ramps/stairs but could never climb

ladders, ropes, or scaffolds.  (*Id.* at 120.)  Charles could occasionally balance, stoop, kneel, crouch, and

crawl.  (*Id.*)  Dr. McKee explained:

> I have looked at the final findings of the ALJ RFC dated 6/4/13 and find that
> the new file does contain new and material evidence.  The ALJ RFC is not
> being adopted as more recent MER in file shows new conditions of BPH,
> bladder muscle dysfunction, Chronic bronchitis, stress incontinence,
> malignant tumor of prostate, skin disorder NOS and verruca vulgaris.
>
> THE DIB PORTION OF THE CLAIM IS RES JUDICATA.

(*Id.* at 121.)

On April 18, 2016, on reconsideration, Leon Hughes, M.D., affirmed Dr. McKee's findings except

for limiting Charles to occasional push and/or pull with his right lower extremity.  (*Id.* at 149-51.)

**D.** **Hearing Testimony**

During the July 1, 2020 hearing, Charles testified to the following:

- He takes care of dirty dishes.  (*Id.* at 1622.)  He occasionally cooks breakfast or dinner.  (*Id.*)  He cooks simple things like spaghetti and meatballs, pork roast, and "shake and bake pork chops."  (*Id.*)  He does not stand at the oven, but he can put things into it.  (*Id.*)  He prepares the food while sitting down at the kitchen table, so he does not have to stand too much.  (*Id.* at 1623.)  He uses a stool that he can lean back on without worrying about tipping over when he works at the stove making eggs or cooking something else.  (*Id.*)  He does not do yard work because it hurts his back too much to bend over.  (*Id.*)  His shoulder starts to hurt after 10-15 minutes.  (*Id.*)  His wife does not allow him to do laundry.  (*Id.*)  Physically he could not do laundry because he cannot bend over.  (*Id.* at 1624.)

- He could carry two gallons of milk for a short distance before it started to hurt his lower back.  (*Id.*)  He could not reach up to get those gallons of milk if they were on a shelf with either arm.  (*Id.* at 1625.)  He can lift his arms over his head about halfway.  (*Id.*)  He cannot lift his elbow above his head.  (*Id.*)  If he puts too much strain on his right arm, it feels like a needle is in his arm.  (*Id.*)  He feels a sharp, tight pinch.  (*Id.*)  His shoulder also creaks.  (*Id.*)  He can lift a gallon of milk with his left arm and put in the refrigerator, but he could not do that with his right arm.  (*Id.* at 1626.)  He can hold a pen and he can hold a coffee cup.  (*Id.*)  He can stand for seven or eight minutes.  (*Id.*)  He could walk fifty yards before needing to sit down.  (*Id.*)  He walks slowly with a limp.  (*Id.* at 1627.)  He cannot walk normally because every time he moves his right leg forward, he feels a pinch in his lower back.  (*Id.*)  He can go to the grocery store, but it takes a while, and he has to sit down afterwards.  (*Id.*)  He does not wear pullover shirts anymore and he has trouble tying shoes because he can't bend over to tie them.  (*Id.*)

- He enjoys setting off fireworks.  (*Id.* at 1628.)  He does not get away from the fireworks after lighting them; he just turns his head away.  (*Id.*)  He can spend ten minutes or so doing that because he's moving around and not standing in one spot, and then he sits down.  (*Id.*)  He does not read or watch TV.  (*Id.*)  When he sits, he sits in his bed in his bedroom with the box spring and mattress on the floor or he sits on a milk crate.  (*Id.* at 1629.)  He does not sit in regular chairs anymore.  (*Id.*)

In the prior decision, the ALJ found past relevant work as a machine operator and a cook.  (*Id.* at 1618-19.)  The ALJ posed the following hypothetical question:

> Assume an individual who can engage in light exertion.  Never climb ladders, ropes, or scaffolds.  All other postures can be performed occasionally.  Avoid concentrated exposure to respiratory irritants and no mental limitations.  Can this person perform any of the claimant's past work?

(*Id.* at 1629-30.)

The VE testified the hypothetical individual would not be able to perform Charles's past work as a machine operator and cook.  (*Id.* at 1630.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as cashier, cleaner housekeeping, and merchandise marker.  (*Id.*)

The ALJ modified the hypothetical to limit the hypothetical individual to occasional foot control with the right lower extremity and frequent overhead reaching on the right.  (*Id.* at 1630.)  The VE testified the hypothetical individual could perform the previously identified jobs at the same numbers.  (*Id.* at 1631.)

In response to further questioning by the ALJ, the VE testified that an individual could be off task 10% of the time and remain employed, but being off task 11-12% of the time, depending on the job, would lead to termination.  (*Id.* at 1631-32.)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.

16

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. § 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since the date of application (20 CFR 416.971 *et seq.*).

2.    Since the date of application, November 2, 2015, the claimant has had the following severe impairments: lumbar degenerative disc disease, right rotator cuff tear with surgical correction, chronic obstructive pulmonary disease (COPD), obesity, obstructive sleep apnea, right quadriceps tendon rupture with surgical correction, and patellar tendonitis of the right knee (20 CFR 416.920(c)).

3.    Since November 2, 2015, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful  consideration of the entire record, the undersigned finds that since July 1, 2008, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) with the following additional limitations: occasional use of foot controls with the right lower extremity, can never climb ladders, ropes, or scaffolds, all other postural movements can be performed occasionally, is limited to frequent overhead reaching, must avoid concentrated exposure to respiratory irritants, and would be off task 10% of the time.

5.    Since July 1, 2008, the claimant has been unable to perform any past relevant work (20 CFR 416.965).

6.  Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. On April 21, 2020, the claimant's age category changed to an individual of advanced age (20 CFR 416.963).

7.  The claimant has at least a high school education (20 CFR 416.964).

8.  Prior to April 21, 2020, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. Beginning on April 21, 2020, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Prior to April 21, 2020, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 416.969 and 416.969a).

10. Beginning on April 21, 2020, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 416.920(c) and 416.966).

11. The claimant was not disabled prior to April 21, 2020, but became disabled on that date and has continued to be disabled through the date of this decision. His disability is expected to last twelve months past the onset date (20 CFR 416.920(g)).

(Tr. 1596-1605.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and

logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.   ANALYSIS

### A.   First Assignment of Error: Evaluation of Mental Impairments

In her first assignment of error, Greger challenges the ALJ's finding at Step Two that Charles' mental impairments were not severe.  (Doc. No. 7 at 20.)  First, Greger argues that since in a June 2013 decision, an ALJ found Charles' depression and organic mental disorder severe impairments, the current ALJ was bound by that decision under *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997) since there was no demonstrated improvement in Charles' mental health condition.  (*Id.* at 20-22.)  In addition, Greger asserts the ALJ erred in giving consulting examiner Dr. Whitlow's opinion great weight when Dr. Whitlow's opinion "lacks a logical bridge between her observations and the evidence and her conclusion," her report "is inconsistent with itself," and she did not conduct intelligence or memory testing.  (*Id.* at 21.)  Therefore, Greger argues, "the decision of the ALJ failed to build a logical bridge between the evidence and conclusion, which is in contrast to <u>Fleischer v. Astrue</u>."  (*Id.* at 22.) (emphasis in original).

The Commissioner responds that substantial evidence supports the ALJ's finding that Charles had no severe mental impairment.  (Doc. No. 9 at 10.)  The Commissioner maintains the ALJ found "significant change" in Charles's mental conditions since the 2013 decision, and the ALJ complied with

*Drummond* as clarified by the Sixth Circuit's decision in *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018).  (*Id.* at 20-21.)

### 1. *Drummond*

In *Drummond*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances."  126 F.3d at 842 (relying on *Senters v. Sec'y of Health & Human Servs.*, No. 91–5966, 1992 WL 78102 (6th Cir. Apr. 17, 1991) (per curiam). *See also Blankenship v. Comm'r of Soc. Sec.*, 624 F. App'x 419, 425 (6th Cir. 2015).  In response, the Commissioner issued AR 98-4(6), which bound ALJs deciding a second disability claim to the prior ALJ's findings "unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding."  1998 WL 283902, at *3.

The Sixth Circuit clarified the scope of *Drummond* in *Earley*.  *Earley* made clear that new regulatory framework for determining disability is a changed circumstance justifying departure from a prior ALJ's ruling, and explicitly stated that because "human health is rarely static. . . .  Any earlier proceeding that found or rejected the onset of a disability could rarely, if ever, have 'actually litigated and resolved' whether a person was disabled at some later date." *Earley,* 893 F.3d at 932-33.

At the outset of her decision, the ALJ explained:

> Pursuant to Acquiescence Rulings 98-3(6) and 98-4(6), absent new and material evidence documenting a significant change in claimant's condition, a residual functional capacity, findings pertaining to past relevant work, and other finding required under the applicable sequential evaluation process for determining disability made in a prior hearing decision by an ALJ are binding on the present adjudicator provided the new claim arises under the same title of the Social Security Act. Many of the findings contained in the prior final and binding decision issued on June 4, 2013 are no longer applicable and are not adopted herein (Exhibit B1A). There is new and material evidence documenting a significant change in the claimant's condition since the prior decision.

(Tr. 1594.)

21

At Step Two, the ALJ found as follows:

> The prior ALJ found that the claimant's severe impairments included status post superior labrum repair of the right shoulder, chronic obstructive pulmonary disease, obesity, obstructive sleep apnea, organic mental disorder, depression, polysubstance abuse in remission, and lumbar degenerative disc disease (Exhibit B1A). The undersigned finds that there is new and material evidence documenting a significant change in the claimant's condition since the prior ALJ decision. Therefore, these findings are not fully adopted. For example, Natalie Whitlow, Ph.D., examined the claimant at the request of the DDD on January 12, 2016 (Exhibit B4F). Dr. Whitlow concluded that the claimant does not appear to have limitations in understanding, remembering, or carrying out instructions, maintaining attention, concentration, persistence, and pace to perform simple or multistep tasks, or responding appropriately to others or to work pressure.

> The undersigned gives great weight to the conclusions of Dr. Whitlow as they are supported by objective sings and findings upon examining the claimant and are consistent with the objective evidence of record. For example, the claimant's treatment records consistently note that his depression is stable on Zoloft and trazodone (Exhibits B1F at 13 and 24, B2F at 27, 114, 133, 147, and 165, B3F at 11 and 48, B9F at 7, 39, 55, and 74, and B10F at 70, 76, and 99). There was some worsening of his symptoms with increased physical pain, but his depression was still controlled (Exhibit B3F at 2). The undersigned also notes a history of drug abuse; however, the objective evidence documents no recent marijuana use (See Exhibit B9F at 2). The claimant also denies crying spells. The undersigned also notes that this evidence is new and material evidence of a significant improvement in the claimant's mental condition since the prior ALJ decision (See Exhibit B1A). Therefore, the prior findings regarding severe mental impairments are not adopted herein.

> Karla Voyten, Ph.D., evaluated the claimant's mental condition based on the evidence of record without examining the claimant on behalf of the DDD on January 15, 2016 (Exhibit B2A). Dr. Voyten concluded that the claimant's mental impairment was not severe. She concluded that the claimant experiences mild limitations in his ability to perform activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration. Dr. Voyten did not adopt prior ALJ mental residual functional capacity because the current objective evidence shows improved mental condition. This assessment was affirmed upon reconsideration (Exhibit B7A).

> While the conclusions of the evaluating sources are based on outdated "paragraph B" criteria, they are consistent with the weight of the objective and subjective evidence of record and are given great weight. The

undersigned finds that the above objective evidence documents no more than mild limitations in the areas of understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. As discussed above, the claimant's depression is stable on medication (Exhibits B1F at 13 and 24, B2F at 27, 114, 133, 147, and 165, B3F at 11 and 48, B9F at 7, 39, 55, and 74, and B10F at 70, 76, and 99). The claimant continues to receive medication for mental health symptoms from his primary care physician; however, he receives no counseling, has not presented to the emergency department, or required hospitalization for psychological symptoms. Many treatment notes document subjective reports of depression, but he denies crying spells. Remote testing demonstrated some significant limitations in memory (See Exhibit B1A at 17). However, more recent examinations document improvement in the claimant's memory and functioning (Exhibit B4F). Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas, they are nonsevere (20 CFR 416.920a(d)(1)).

The claimant continues to alleged limitations due to memory loss. However, this is a symptom and there is no objective testing of record, which documents or quantifies the claimant's symptoms. The claimant's representative initially argued at the hearing in 2017, that the claimant had "significant issues with memory." However, there is no evidence supporting this allegation and most examinations note normal psychiatric findings, as noted above. The claimant has not received treatment for mental health symptoms other than medication for depression from his primary care physician. The undersigned finds that there is no objective evidence to support a medically determinable impairment to explain the claimant's complaints of memory loss.

(*Id.* at 1596-98.)

Here, as Greger concedes, the relevant time frame for purposes of judicial review begins on November 16, 2015 (Doc. No. 7 at 5) – the date of Charles's SSI application – and runs through April 20, 2020, the date before the ALJ found Charles's change in age category rendered him disabled. This period post-dates the time frame considered by the previous ALJ when the June 2013 decision was issued. The Sixth Circuit's guidance in *Earley* makes clear that *res judicata* cannot properly be applied to this case, as it covers a different time period than Charles's prior application. Charles's present claim is that he was disabled when he filed his application in 2015, an issue the ALJ in 2013 could not have considered. Therefore, the ALJ properly conducted a *de novo* review of the record. Greger does not argue that the

23

ALJ ignored the first administrative law judge's findings.  The ALJ explicitly considered the prior ALJ's findings, and explained she was not bound by *res judicata* because there had been "a significant change" in Charles's condition since the prior decision.  (Tr. 1594, 1596-98.)

There is no error.

### 2.  Dr. Whitlow's Opinion

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 416.927(c),[5] and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id*.  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id*. § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id*. § 404.1502, 404.1527(c)(2)."  *Id*.  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  Social Security Ruling ("SSR") 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).[6]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart*, 710 F.3d at 376; 20

---

[5] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[6] SSR 96-6p was rescinded and replaced by SSR 17-2p, effective March 27, 2017.  *See* SSA 17-2p, 2017 WL 3928306, at *1 (SSA Mar. 27, 2017).

C.F.R. § 416.927(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188, at *4 (SSA July 2, 1996)).[7]  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[8]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188, at *5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not,

---

[7] SSR 96-2p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298, at *1.

[8] Pursuant to 20 C.F.R. § 416.927(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.  "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  20 C.F.R. § 404.1527(c).  Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion.  *Id.* § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

The ALJ weighed and analyzed the opinion of Dr. Whitlow as follows:

> The undersigned gives great weight to the conclusions of Dr. Whitlow as they are supported by objective sings and findings upon examining the claimant and are consistent with the objective evidence of record. For example, the claimant's treatment records consistently note that his depression is stable on Zoloft and trazadone (Exhibits B1F at 13 and 24, B2F at 27, 114, 133, 147, and 165, B3F at 11 and 48, B9F at 7, 39, 55, and 74, and B10F at 70, 76, and 99). There was some worsening of his symptoms with increased physical pain, but his depression was still controlled (Exhibit B3F at 2). The undersigned also notes a history of drug abuse; however, the objective evidence documents no recent marijuana use (See Exhibit B9F at 2). The claimant also denies crying spells. The undersigned also notes that this evidence is new and material evidence of a significant improvement in the claimant's mental condition since the prior ALJ decision (See Exhibit B1A). Therefore, the prior findings regarding severe mental impairments are not adopted herein.

(Tr. 1596-97.)

As a non-treating source, the ALJ owed no deference to the opinion of Dr. Whitlow.  An ALJ is not required to give "good reasons" for rejecting a non-treating or non-examining opinion.  *Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 753 (N.D. Ohio 2018) (citation omitted).

The ALJ considered and weighed the medical opinion evidence of record and provided an explanation for the weight assigned.  It is the ALJ's duty, not this Court's, to weigh the evidence and resolve any conflicts, and she did so here.

The Court notes that the state agency reviewing psychological consultants, who had the benefit of Dr. Whitlow's opinion, found Charles's mental impairments not severe.  The ALJ assigned great weight to their opinions as well (*id.* at 1597), a finding Greger does not challenge on appeal.  (Doc. No. 7.)

Although Greger cites evidence from the record she believes supports a different finding, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton*, 246 F.3d at 772-73.  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

There is no error.

**B.      Second Assignment of Error: Evaluation of Right Shoulder Condition**

In her second assignment of error, Greger asserts the ALJ erred in evaluating Charles's right shoulder condition.  (Doc. No. 7 at 23.)  Again, Greger argues that the 2013 ALJ decision found Charles had a severe impairment of "'status post superior labrum repair right shoulder'" and the record was "devoid of evidence of a significant improvement in Charles' right shoulder condition."  (*Id.*)  Greger asserts the ALJ further erred in "offer[ing] a mere scintilla of evidence" in support for determining

27

Charles's shoulder condition improved and maintains that one record cited by the ALJ "actually stated that Claimant's right shoulder pain was getting worse." (*Id.*)

The Commissioner responds that the "ALJ adequately considered [Charles's] physical impairments and assessed limitations supported by the record evidence." (Doc. No. 9 at 12.) The Commissioner maintains the ALJ found improvement in Charles's right shoulder condition since the 2013 decision, and the ALJ complied with *Drummond* as clarified by *Earley*. (*Id.* at 13-16.)

For the same reasons set forth above regarding Charles's mental health conditions, *Earley* makes clear that *res judicata* cannot properly be applied to this case, as it covers a different time period than Charles's prior application. Charles's present claim is that he was disabled when he filed his application in 2015, an issue the ALJ in 2013 could not have considered. Therefore, the ALJ properly conducted a *de novo* review of the record. Greger does not argue that the ALJ ignored the first administrative law judge's findings. The ALJ explicitly considered the prior ALJ's findings, and explained she was not bound by *res judicata* because there had been "a significant change" in Charles's condition since the prior decision. (Tr. 1594, 1599-1600, 1602-03.) There is no error.

In the RFC analysis the ALJ found as follows:

> Treatment records from January 2013 document continued treatment for back pain, including injections; however, straight leg raises were negative (Exhibit B2F at 182). On February 5, 2013, the claimant reported that he was lifting a large heavy coil and injured his back (Exhibit B2F at 178). Upon follow-up, the claimant exhibited mild restriction of active and passive mobility of his upper extremity with pain (Exhibit B6F at 13). The claimant sought treatment in November 2014 in the emergency department when he fell on ice and re-injured his back (Exhibit B2F at 54). There was tenderness on examination, but normal range of motion. On outpatient follow-up, the claimant had some pain in the impingement position, but strength was satisfactory (Exhibit B6F at 5).
>
> Dr. Shoyer's last treatment note in December 2014 demonstrate "satisfactory strength" of the right shoulder (Exhibit B6F at 5). Injections were helpful as the claimant previously exhibited "poor active and passive mobility secondary to pain" in September 2014. In fact, injections were routinely determined to be "helpful." The claimant had no complaints of

arthralgias and no headaches and the claimant was advised [sic] "try to increase/maintain activity" (Exhibit B6F at 6-7).

A follow-up MRI of the lumbar spine in December 2015 showed only mild progression of the claimant's degenerative disease, small central disc protrusion at the L5-S1 level without significant canal stenosis, and mild bony foraminal stenosis at the L5 -S1 level (See Exhibit B9F at 18). An x-ray demonstrated mild to moderate disc space narrowing at the L4-5 and L5-S1 level (Exhibit B9F at 19).

On examination in April 2016, the claimant exhibited no arm or leg weakness and there were no shoulder complaints (Exhibit 9F at 7). Straight leg raises were also negative, but there was some decreased flexion and extension of the lumbar spine. The claimant had a normal gait, and reflexes were symmetrical. In May 2016, the claimant was seen for chronic low back pain, polyarthraliga, and chronic headaches (Exhibit B9F at 17). The undersigned notes that there was no mention of shoulder pain or limitations. The claimant's adherence to treatment was poor and he refused physical therapy as he reported increased pain with therapy. On examination, straight leg raises were negative bilaterally, sensation was within normal limits, and lower extremity muscle strength was normal. The claimant exhibited spam and tenderness and his gait was antalgic. Flexion and extension were decreased and reflexes were decreased. Chronic pain rehabilitation was recommended and graded aerobic activity was emphasized; however, the claimant remained pessimistic about this treatment.

Follow-up treatment records document that the claimant was avoiding activity for fear of pain (Exhibit B10F at 61). The claimant sought follow-up for chronic low back pain, polyarthralgia, headaches, and depression in October 2018. On examination, the claimant's gait was antalgic, posture and spinal curves were normal, there was muscle spasm and tenderness in the lumbar spine, and flexion and extension of the lumbar spine were decreased. Reflexes were also decreased; however, lower extremity muscle strength was normal, tone was within normal limits, straight leg raise test was negative, and sensation to light touch was within normal limits. Pain rehabilitation was recommended and no spine injections or surgery were recommended. Follow- up treatment records note that the claimant is on pain medication for chronic back pain (Exhibit B10F at 77). The claimant denied drowsiness with medication. On examination, the claimant had a normal gait and straight leg raise testing was negative; however, he had some limited range of motion of the lumbar spine.

In February 2019, the claimant's only complaint was low back pain (Exhibit 10F at 79). The claimant reported that he does not exercise due to pain and can only walk 100 yards. He also refuses to wear his CPAP machine because it causes headaches. On examination, the claimant had full range of motion of the neck and decreased range of motion of the back. The

claimant's treating source advised that pain management and physical therapy could help him become more mobile, but the claimant was not interested in treatment. On follow-up, the claimant denied syncope, chest pain, dyspnea, palpations, daily headaches, vertigo, dizziness, and lightheadedness (Exhibit B10F at 98). There was also no weakness in the arms or legs. Straight leg raises were negative, but tenderness was noted on both sides of the lower spine. Gait was normal.

The claimant's most recent treatment records from March 2020 document full strength in all muscle groups and normal gait (Exhibit B10F at 109). The claimant also complained of right shoulder pain; however, he denied headaches and syncope. It was determined that the claimant was not a surgical candidate and he was referred to the pain clinic with physical therapy recommended.

* * *

The undersigned has considered the medical opinions of record in rendering this decision. Notably, the record does not contain any opinions from treating or examining physician indicating that the claimant is disabled or even has limitations greater than those determined in this decision. Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions place on the claimant by treating sources. Yet a review of the record in this case reveals no restrictions recommended by the treating providers.

Steve McKee, M.D., evaluated the claimant's physical condition based on the evidence of record without examining the claimant on behalf of the DDD on November 29, 2015 (Exhibit B2A). Dr. McKee declined to adopt the residual functional capacity of the prior ALJ decision noting a new condition of chronic bronchitis. He concluded that the claimant is capable of light exertion work with occasional climbing of ramps/stairs, no climbing of ladders/ropes/scaffolds, and occasional balancing, stooping, kneeling, crouching, and crawling. This assessment was essentially affirmed upon reconsideration except for the addition of occasional use of foot controls with the right lower extremity (Exhibit B6A).

The undersigned gives partial weight to the conclusions of the evaluating sources because they did not include any environmental limitations for respiratory irritants, although they are otherwise generally consistent with the evidence of record. For example, as a result of limited range of motion of the spine, exacerbating effects of obesity, right upper extremity pain, and continued knee pain, the claimant is limited to light exertion work, frequent reaching overhead, and occasional postural activities except for no climbing of ladders, ropes, or scaffolds. The claimant's shoulder pain has been relatively manageable and whatever limitations he had as a result do not result in less than light exertion limitations. His right shoulder impairment

30

was treated routinely with injections and his function was not significantly impacted according to his treating physician, Dr. Shroyer. In fact, he did not require any additional injections after 2014. The claimant has received injections for his low back pain. Therefore, any permanent reduction in elbow strength, combined with effects of his biceps rupture and back pain, is adequately addressed in limiting the claimant to lifting/carrying twenty pounds occasionally and ten pounds frequently, and frequent reaching overhead. The claimant is also limited to occasional use of foot controls on the right due to continued right knee pain. He is not further limited due to intact strength throughout. However, the undersigned includes additional limitations for avoiding concentrated exposure to respiratory irritants in order to avoid exacerbating the claimant's respiratory conditions. Finally, the undersigned finds that the claimant would be off task 10% of the time due to exacerbations in pain.

The prior ALJ concluded that the claimant was limited to light exertion work with occasional climbing of ramps and stairs, but never climbing of ladders, ropes or scaffolds. He could occasionally reach overhead with the right upper extremity and was unlimited for reaching in all other directions with the right upper extremity. He must avoid concentrated exposure to fumes, odors, dusts, gases and poorly ventilated areas and avoid all hazards, including unprotected heights and moving machinery. He could perform simple, routine tasks, i.e. unskilled work, with only occasional interaction with the public and only brief and superficial interactions with supervisors and co-workers, i. e. of short duration and for a specific purpose, he would perform best with oral/demonstrated directions in a setting wherein duties were routine and predictable, with no high production requirement or fast pace and he was capable of low-stress work, i.e. no arbitration, negotiation, responsibility for the safety of others or supervisory responsibility (Exhibit B1A). As discussed above, the undersigned finds new and material evidence that the claimant's mental impairments are no longer severe. Therefore, limitations related to these impairments are not adopted herein. In addition, treatment records, as outlined above, document some improvement in the claimant's shoulder impairment since the prior ALJ decision.  Therefore, limitations related to this impairment are not as significant. There was no evidence of instability or significantly impaired gait; therefore, no limitation related to hazards remain necessary.

(Tr. 1599-1603.)

Contrary to Greger's argument, the ALJ relied on more than "a mere scintilla of evidence" in finding improvement in Charles's right shoulder condition.  (*Id.*)  Further, Greger misreads the ALJ's decision with respect to the 2014 medical record Greger claims the ALJ misinterpreted.  As the ALJ explained, the cited records show that while Greger demonstrated "poor active and passive mobility

31

secondary to pain" in September 2014, in December 2014 Dr. Shoyer noted injections had helped and while there was pain in the impingement position, there was satisfactory strength in the shoulder.  (*Id.* at 1252, 1255-59.)

## C.    Third Assignment of Error: RFC and Subjective Symptom Analyses

In her third assignment of error, Greger argues the ALJ erred in failing to follow the requirements of SSR 96-8p in formulating the RFC and that the RFC lacked the support of substantial evidence.  (Doc. No. 7 at 24.)   Greger asserts the "ALJ's RFC finding fails to take into account the pervasive daily impacts of Charles' physical, intellectual and psychological conditions." (*Id.* at 25.)  Greger maintains the ALJ's decision "is facially flawed" as it failed to consider Charles's mental impairments and right shoulder condition, as raised in her first two assignments of error.  (*Id.*)  Greger further argues the ALJ erred in determining an RFC that failed to account for the pain from Charles's shoulder, knee, and back conditions. (*Id.* at 27.)  Greger maintains Charles's testimony regarding these limitations was supported by the record evidence.  (*Id.* at 26.)   Greger asserts Charles should have been limited to sedentary work and found disabled.  (*Id.*)

The Commissioner responds that the ALJ complied with the requirements of SSR 96-8p and substantial evidence supports the ALJ's RFC finding.  (Doc. No. 9 at 22-23.)  The Commissioner implies that Greger's third assignment of error is an improper invitation for the Court to reweigh the evidence. (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the

relevant evidence (20 C.F.R. § 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x

33

771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p,[9] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[10] determination of the individual's statements based on the entire case record. Credibility determinations

---

[9] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the July 1, 2020 hearing.

[10] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* 20 C.F.R. § 416.929; SSR 16-3p, 2016 WL 1119029 (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should consider.[11]  The ALJ need not analyze all seven factors but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Contrary to Greger's assertion, the ALJ considered Charles's mental impairments and his right shoulder condition, despite finding them non-severe, in the RFC analysis.  (Tr. 1599-1603.) The ALJ also

---

[11] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

considered Charles's leg and back impairments.  (*Id.*)  The ALJ acknowledged Charles's testimony and other statements regarding his symptoms and limitations.  (Tr. 1599.)  The ALJ determined Charles's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (*Id.*)  However, the ALJ found her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision.  (*Id.*)   The record evidence, as noted by the ALJ, is not entirely consistent with Charles's allegations of disabling conditions.  (*Id.* at 1599-1603.)  The ALJ credited some of Charles's subjective symptoms but did not accept them to the extent alleged because of findings on examinations, his own statements, and lack of treatment, all factors to be considered under the regulations.  (*Id.*)  The ALJ found the evidence warranted limitations to light work, frequent overhead reaching, occasional postural activities except for no climbing of ladders, ropes, or scaffolds, and time off task of 10% of the workday, but no further limitations.  (*Id.*)  Again, although Greger cites evidence from the record she believes supports a more restrictive RFC, the ALJ's findings are subject to reversal "merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton*, 246 F.3d at 772-73.

The Court is able to trace the path of the ALJ's reasoning regarding Charles's RFC.  There is no error.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: July 22, 2022                                        _s/ Jonathan Greenberg_
                                                                Jonathan D. Greenberg
                                                                United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).